USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/4/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

KENDRA CORBIN,

Plaintiff,

-against-

24-cv-1613 (CM)

TRIBOROUGH BRIDGE & TUNNEL AUTHORITY d/b/a M.T.A. BRIDGES & TUNNELS, THE METROPOLITAN TRANSIT AUTHORITY, THE NEW YORK CITY TRANSIT AUTHORITY, and ROBERT RAMOS, Individually,

Defendants.

---------------------------------------------------------------- x

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

McMahon, J.:

This employment-discrimination action arises out of two related sets of events. Plaintiff Kendra Corbin worked for Defendant Triborough Bridge and Tunnel Authority d/b/a M.T.A. Bridges & Tunnels ("TBTA") as a Bridge and Tunnel Officer ("BTO"). She alleges that Defendant Robert Ramos, a TBTA Sergeant, subjected her to sexual harassment and engaged in nonconsensual sexual conduct with her while they were working at TBTA's Robert F. Kennedy Bridge Facility (the "RFK Facility"). Corbin also alleges that, when she asked to change assignments in order to avoid Ramos, TBTA refused to continue keeping her on temporary light-duty (an arrangement under which she had been working after suffering an on-duty injury) and put her back on injured-on-duty leave ("IOD"). Shortly thereafter, TBTA fired her.

Corbin's Second Amended Complaint pleads a total of nine separate causes of action. Against TBTA, the Metropolitan Transportation Authority ("MTA"), and the New York City Transit Authority ("NYCTA") – collectively, the "MTA Defendants" – Corbin asserts: (1) sex discrimination, premised principally on a hostile work environment, under Title VII of the Civil Rights Act of 1964; (2) disability discrimination, including failure to accommodate and discriminatory termination, under the Americans with Disabilities Act ("ADA"); (3) retaliation under the ADA; (4) sex- and disability-based discrimination under the New York City Human Rights Law ("NYCHRL"); (5) retaliation under the NYCHRL; (6) sex- and disability-based discrimination under the New York State Human Rights Law ("NYSHRL"); and (7) retaliation under the NYSHRL. The fourth and sixth causes of action – the NYCHRL and NYSHRL discrimination claims – are also pleaded against Ramos. Corbin also asserts claims against Ramos for aiding and abetting violations of the NYSHRL and the NYCHRL. Dkt. No. 64, Second Amended Complaint ("SAC"), ¶¶ 100–128.

Ramos moves for summary judgment dismissing all claims asserted against him. Dkt. No. 76. The MTA Defendants separately move for summary judgment dismissing all claims asserted against them. Dkt. No. 86.

For the reasons set forth below, the MTA Defendants' motion is GRANTED as to all claims asserted against MTA and NYCTA. As to TBTA, the motion is GRANTED as to all claims except: (1) Corbin's sex-based hostile-work-environment claim under Title VII in Count One; (2) the sex-based hostile-work-environment component of her NYCHRL claim in Count Four; and (3) the sex-based hostile-work-environment component of her NYSHRL claim in Count Six. TBTA's motion is DENIED as to those claims.

Ramos's motion is GRANTED except as to the direct sex-based hostile-work-environment claim asserted against him under the NYCHRL in Count Four.

Accordingly, all claims against MTA and NYCTA are DISMISSED, as are all disability-discrimination claims, all retaliation claims, both aiding-and-abetting claims, and all direct NYSHRL claims against Ramos. The claims proceeding to trial are Corbin's Title VII, NYSHRL, and NYCHRL sex-based hostile-work-environment claims against TBTA and her direct NYCHRL sex-based hostile-work-environment claim against Ramos.

## I. BACKGROUND

The following facts are drawn from the parties' Local Civil Rule 56.1 submissions and the evidence cited therein. *See* Dkt. No. 90, MTA Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("MTA 56.1"); Dkt. No. 106, Plaintiff's Opposition to the MTA Defendants' Statement of Undisputed Facts and Counterstatement ("Pl. 56.1 Resp."); Dkt. No. 78, Ramos's Rule 56.1 Statement ("Ramos 56.1"); Dkt. No. 103, Plaintiff's Opposition to Ramos's Rule 56.1 Statement ("Pl. Ramos 56.1 Resp."). Except where otherwise indicated, the facts recited below are undisputed. Where the parties disagree, the Court identifies the dispute and, as it must on Defendants' motions, describes the evidence in the light most favorable to Corbin.

### A. The Parties and Their Employment Roles

MTA, NYCTA, and TBTA are public benefit corporations created under different provisions of the New York Public Authorities Law. NYCTA and TBTA are legally distinct from MTA. TBTA manages, maintains, and operates seven bridges and two tunnels in New York City, including the RFK Facility, located at what was formerly known as the Triborough Bridge linking Manhattan, the Bronx and Queens. MTA 56.1 ¶¶ 1–6; Pl. 56.1 Resp., ¶¶ 1–6.

Corbin and Ramos were hired by TBTA on April 4, 2005, as BTOs. They attended the same training class. Corbin remained a BTO throughout her employment. Ramos was promoted to Sergeant in December 2016. MTA 56.1, ¶¶ 7–8, 12; Pl. 56.1 Resp., ¶¶ 7–8, 12. During the period relevant to this action, Corbin and Ramos both worked out of the RFK Facility. MTA 56.1, ¶ 35; Pl. 56.1 Resp., ¶ 35.

BTOs perform traffic, security, emergency-response, and law-enforcement functions at TBTA bridges and tunnels. These functions include assisting stranded motorists, directing and clearing traffic, patrolling roadways and structures, responding to traffic emergencies, and serving as peace officers. MTA 56.1, ¶ 13; Pl. 56.1 Resp., ¶ 13. Most BTO assignments are patrol assignments. The two nonpatrol assignments available within the BTO title are Desk Officer and Clerk. MTA 56.1, ¶¶ 13, 48; Pl. 56.1 Resp., ¶¶ 13, 48. TBTA maintains that carrying a firearm and being able to lift more than ten pounds are essential functions of a patrol assignment. MTA 56.1, ¶ 14. Corbin asserts that neither of these requirements is essential to every assignment held by an employee with the BTO title, pointing to the administrative work that she performed while subject to medical restrictions. Pl. 56.1 Resp., ¶¶ 14, 25. The administrative assignment was, of course, not a patrol assignment.

The parties also disagree about the nature and extent of Ramos's authority over Corbin. It is undisputed that Sergeants do not hire or fire BTOs, set their salaries, select their annual tours through the seniority-based bidding process, or conduct their regular performance evaluations. MTA 56.1, ¶¶ 79–86; Pl. 56.1 Resp., ¶¶ 79–86. Sergeants can write up BTOs for workplace infractions, although the ensuing disciplinary decision is made at a higher level. Sergeants may also convey daily assignments, make certain adjustments to break times, and approve completed

overtime in the TBTA's timekeeping system. MTA 56.1, ¶¶ 87, 89, 91, 94; Pl. 56.1 Resp., ¶¶ 87, 89, 91, 94.

TBTA and Ramos both contend that Ramos did not directly supervise Corbin because Corbin was assigned to the Fare Evasion Task Force ("FETF"), which had its own supervision even though Corbin physically worked at the RFK Facility. MTA 56.1, ¶ 78. Corbin counters that Ramos outranked her; directed BTOs' daily activities when acting as a Sergeant; directed her to perform administrative tasks; could write her up; and approved at least some of her overtime. She testified that she understood Ramos to be one of her supervisors, particularly when their shifts overlapped. Pl. 56.1 Resp., ¶¶ 106–122.

### B. Corbin's On-Duty Injury and Return to Work

On November 17, 2020, Corbin was injured in a motor-vehicle accident while on duty. She was thereafter placed on injured-on-duty ("IOD") leave. MTA 56.1, ¶¶ 15–16; Pl. 56.1 Resp., ¶¶ 15–16. TBTA employees who are not medically cleared to return to full duty generally remain on IOD leave unless they obtain an accommodation that allows them to work subject to their medical restrictions. MTA 56.1, ¶ 17; Pl. 56.1 Resp., ¶ 17.

By June 2021, a TBTA physician had approved Corbin to return to work subject to restrictions prohibiting her from lifting more than ten pounds or carrying a firearm. MTA 56.1, ¶ 22; Pl. 56.1 Resp., ¶ 22. On June 29, 2021, Corbin submitted a Reasonable Accommodation Request form seeking light-duty work that would permit her to perform administrative tasks. MTA 56.1, ¶¶ 23–24; Pl. 56.1 Resp., ¶¶ 23–24. TBTA initially denied the request on the ground that there were no vacant desk or administrative assignments at any TBTA facility. MTA 56.1, ¶ 26; Pl. 56.1 Resp., ¶ 26. TBTA also sent Corbin notices dated May 20 and September 23, 2021, advising her that failure to resolve her employment status and return to duty upon the exhaustion

of one cumulative year of IOD leave would result in termination. Dkt. No. 107-8, Final Termination Letter, TBTACORBIN_0000153.

Corbin appealed that determination in October 2021. After a subsequent medical evaluation again cleared her to return subject to the ten-pound lifting restriction and the prohibition against carrying a firearm, TBTA officials looked for work that she could perform. MTA 56.1, ¶¶ 28–31; Pl. 56.1 Resp. ¶¶ 28–31.

On October 21, 2021, Corbin returned to work as a member of the FETF, physically stationed at the RFK Facility, where she performed administrative or desk-related duties rather than patrol duties. MTA 56.1, ¶¶ 32–34; Pl. 56.1 Resp., ¶¶ 32–34. TBTA describes this role as a temporary light-duty assignment, rather than a formal ADA accommodation, because Corbin was not performing the essential functions of a patrol position. MTA 56.1, ¶ 34. Corbin describes it as a light-duty disability accommodation that allowed her to remain in her existing BTO or FETF position while performing administrative work until she was medically cleared for full duty. Pl. 56.1 Resp., ¶¶ 32–34, 138, 143–149. Whatever its characterization, Corbin continued working under that arrangement for approximately one year.

### C. Ramos's Alleged Conduct Toward Corbin

From October 2021 through November 2022, Corbin and Ramos both worked at the RFK Facility. MTA 56.1, ¶ 35; Pl. 56.1 Resp., ¶ 35. It is undisputed that, during at least part of that period, Ramos made comments of a sexual nature to Corbin, asked her for hugs, touched her breasts, and kissed her. MTA 56.1, ¶ 36; Pl. 56.1 Resp., ¶ 36. What is very much disputed is whether this conduct – and the even more serious sexual conduct that followed – was consensual.

Corbin testified that Ramos's conduct was unwanted and became progressively more invasive. She says that he repeatedly made sexual comments, touched and groped her, exposed

himself to her, masturbated in her presence, and persisted after she told him to stop. Pl. 56.1 Resp., ¶¶ 123–126. Corbin further alleges that, on September 30 and October 10, 2022, Ramos forced her to perform oral sex on him in an office at the RFK Facility. *Id.*, ¶¶ 125–126.

Ramos acknowledges that sexual encounters occurred in Corbin's office on September 21, September 30, and October 10, 2022, including two encounters during which Corbin performed oral sex on him. MTA 56.1, ¶¶ 38–40. But he denies that he forced or coerced Corbin and maintains that their sexual interactions were consensual. Corbin maintains that each of the encounters was nonconsensual. Pl. 56.1 Resp., ¶¶ 38–40.

Corbin did not submit a complaint about Ramos to TBTA's human-resources or equal-employment personnel before her employment ended. MTA 56.1, ¶¶ 37, 41. She did, however, report Ramos to the NYPD on December 16, 2022, while she was still employed by TBTA; the NYPD interviewed her on December 20. Pl. 56.1 Resp., ¶¶ 161–162. Corbin says that she was afraid to report Ramos internally because Ramos outranked her, was well regarded by upper management, could write her up, and could influence decisions about her employment. Pl. 56.1 Resp., ¶¶ 127–131. She also cites a poor experience, when management, in her view, failed to address a complaint of workplace bullying that she had lodged against a female colleague named Goodridge. Corbin testified that Goodridge bullied her from approximately 2009 until 2019 and that, although the sergeants to whom she complained agreed that Goodridge's conduct was unprofessional, they took no action before Goodridge retired. *Id.*, ¶¶ 130–131.

Corbin contends that some of Ramos's less serious sexualized conduct occurred in the presence of other TBTA personnel. She testified that Sergeant Anthony Volpe "would have overseen or should have noticed" Ramos attempting to hug or touch her. Dkt. No. 107-1, Corbin Dep. Tr. at 64:19–65:4. The Second Amended Complaint also alleges that Volpe was present

when Ramos asked Corbin whether she had "sex last night" and, on November 25, 2022, when Ramos touched her breasts, asked her for a hug, blocked her exit from a storage area, and made an explicitly sexual remark. Dkt. No. 64, ¶¶ 35, 55. The Second Amended Complaint describes Volpe as "another supervisor," and Ramos testified that a sergeant who observed workplace conduct constituting sexual harassment would be required to report it. Pl. 56.1 Resp., ¶ 132. Corbin also testified that BTO Octavio Barrios was present when Ramos called her breasts "melons" and "bongos." *Id.*, ¶ 136. Defendants dispute whether Volpe or Barrios observed conduct that would reasonably have alerted them that Corbin was being subjected to unwelcome sexual harassment, and Volpe denied during TBTA's investigation that he witnessed any inappropriate comments, touching, or other sexual conduct involving Corbin and Ramos.

### D. Corbin's Transfer Bid, Return to IOD Leave, and Separation

On October 31, 2022, TBTA announced a facility-transfer bidding process for BTOs. An employee who transferred out of the FETF or to a different facility would temporarily lose seniority for six months. MTA 56.1, ¶ 42; Pl. 56.1 Resp., ¶ 42.

On November 9, Corbin spoke with TBTA Chief Equal Employment Opportunity Officer Joyce Brown about an overtime issue. Brown asked when Corbin expected to return to full duty and whether she had considered bidding for a desk position. Corbin explained that she would first have to transfer out of the FETF and that the resulting loss of seniority might make it more difficult for her to obtain a desk assignment. MTA 56.1, ¶ 43; Pl. 56.1 Resp., ¶ 43.

Corbin thereafter submitted a bid to transfer from the FETF to the RFK Facility. The transfer was accepted on November 14, 2022, and Corbin lost six months of seniority. MTA 56.1, ¶¶ 44–45. Corbin testified that she sought the transfer because she needed to distance herself from Ramos and believed that a midnight tour would place her in a safer working environment. Pl. 56.1

Resp., ¶¶ 139–143. She did not tell Brown that Ramos's conduct was the motivation for her to bid to transfer; she referred instead to generalized personal reasons. MTA 56.1, ¶ 56; Pl. 56.1 Resp., ¶ 56.

On November 22, 2022, Corbin submitted a second bid ranking the particular assignments she wanted at the RFK Facility. She ranked patrol assignments as her first six choices, a Desk Officer assignment as her seventh choice, and a Clerk assignment as her fourteenth choice. MTA 56.1, ¶ 46; Pl. 56.1 Resp., ¶ 46. She received her second choice – an 11:00 p.m. patrol assignment. MTA 56.1, ¶ 49; Pl. 56.1 Resp., ¶ 49.

At the time of the bid, however, Corbin remained medically restricted from lifting more than ten pounds or carrying a firearm. MTA 56.1, ¶ 47; Pl. 56.1 Resp., ¶ 47. TBTA therefore concluded that she could not perform the essential functions of the patrol assignment she had obtained. Corbin maintains that she was not requesting immediate restoration to unrestricted patrol duty; rather, she wanted to transfer to the new tour while temporarily continuing the same light-duty arrangement under which she had worked during the preceding year. Pl. 56.1 Resp., ¶¶ 143–150.

On November 30, 2022, Brown and other TBTA officials discussed Corbin's situation. The EEO activity log reflects that there were no vacant desk assignments as of December 1, 2022; that Corbin had approximately twenty-eight days of IOD leave remaining before she would accumulate 365 days of leave arising from the same occupational injury; and that a secondary bid for a desk assignment was expected shortly, although Corbin's loss of seniority as a result of her recent transfer meant that she was not guaranteed to obtain it. The activity log described the secondary bid as an "option to avoid termination" and stated that Corbin should be offered the

opportunity to engage in the interactive process, including possible reassignment. MTA 56.1, ¶ 50; Pl. 56.1 Resp., ¶ 50.

Section 71 provides that a public employee absent because of a disability resulting from an occupational injury or disease "shall be entitled to a leave of absence for at least one year," unless the disability permanently incapacitates the employee from performing the duties of the position. N.Y. Civ. Serv. Law § 71. Once the employee has received that minimum period of leave, the statute permits the employer to separate the employee from service; it does not require automatic termination on the 365th day. Section 71 also preserves the employee's right, after the disability ends, to seek a medical examination and possible reinstatement to an available qualifying position or placement on a preferred list. *Id.*

On December 1, TBTA officials told Corbin that she could not report to the patrol assignment because of her medical restrictions and that there was no limited-duty assignment available at the RFK Facility. She was placed back on IOD leave effective December 1, 2022. MTA 56.1, ¶¶ 51–52; Pl. 56.1 Resp., ¶¶ 51–52.

Brown spoke with Corbin on December 1, 2022. Corbin identified two desk assignments that she believed were vacant. Brown advised her that filling assignments was constrained by the applicable collective-bargaining agreement and an arbitration award concerning assignment vacancies, seniority, and overtime procedures. Brown told Corbin that she would have to submit a new Reasonable Accommodation Request form so that TBTA could determine whether she could be accommodated in her assigned position or reassigned to another vacant position. MTA 56.1, ¶¶ 53–55; Pl. 56.1 Resp., ¶¶ 53–55. Brown emailed the form to Corbin that day, but Corbin did not complete or return it. MTA 56.1, ¶¶ 57–58; Pl. 56.1 Resp., ¶¶ 57–58.

A December 9, 2022 medical evaluation confirmed that Corbin remained unable to lift more than ten pounds or carry a firearm. MTA 56.1, ¶ 59; Pl. 56.1 Resp., ¶ 59. On December 15, BTO Laniece Denning called Corbin and advised her that she could submit a secondary bid for an RFK desk assignment. Denning followed up by email and text message on December 16. MTA 56.1, ¶¶ 60–61; Pl. 56.1 Resp., ¶¶ 60–61. The desk assignment was scheduled to begin on December 29.

On December 16, Corbin told a friend that she intended to decline the bid, explaining, "I can't go back, lawsuit or not. . . . I never wanted desk. The schedule not good." MTA 56.1, ¶ 62; Pl. 56.1 Resp., ¶ 62. On December 18, she informed Denning that she would not submit a bid. MTA 56.1, ¶ 63; Pl. 56.1 Resp., ¶ 63. Corbin later testified that she also declined because she believed that she would be separated on December 28, one day before the position began. Pl. 56.1 Resp., ¶¶ 155–156. At the time she declined the bid, however, TBTA had not yet informed her that it had decided to separate her on December 28.

On December 20 – two days after Corbin declined to bid for the desk assignment – TBTA sent her a letter stating that her employment would be terminated effective December 28. Dkt. No. 107-8, Final Termination Letter, TBTACORBIN_0000153. The letter stated that TBTA's records showed that Corbin had accumulated 365 days of intermittent IOD leave since her November 2020 injury. It also stated that TBTA had sent Corbin letters dated May 20 and September 23, 2021, advising her that failure to resolve her employment status and return to duty upon the expiration of her cumulative one-year IOD leave "would result in the termination of [her] employment." *Id.* The December 20 letter further advised Corbin of her rights under § 71 to seek a medical examination and possible reinstatement after the termination of her disability. *Id.*

TBTA separated Corbin's employment effective December 28, 2022, citing Civil Service Law § 71 and her accumulation of 365 days of IOD leave for the same injury. MTA 56.1, ¶ 64; Pl. 56.1 Resp., ¶ 64. Although TBTA maintains that separation occurred automatically by operation of § 71, the statute did not require TBTA to separate Corbin on December 28. It authorized TBTA to do so after she had received the minimum leave guaranteed by the statute. Corbin contends that TBTA would not have exercised that authority had it continued her prior light-duty arrangement or completed the reassignment process.

### E. Corbin's Report to the NYPD and TBTA's Investigation

On December 16, 2022, while she was out on IOD leave but before her employment formally ended, Corbin finally reported Ramos, not to TBTA, but to the New York City Police Department. The NYPD interviewed her on December 20. On December 22, an NYPD detective informed a senior investigator in the MTA Inspector General's Office of Corbin's allegations. The MTA investigator stated that he would consult his supervisors about whether the Inspector General's Office would open a case. The NYPD closed its investigation that same day.

According to the summary-judgment record, the MTA Inspector General's Office did not open an investigation and did not transmit Corbin's allegations to TBTA's human-resources or equal-employment personnel before her December 28 separation. Pl. 56.1 Resp., ¶¶ 162–167.

On January 6, 2023, Corbin's attorneys served TBTA with a notice of claim alleging that Ramos had sexually harassed her. This was the first direct notice of Ramos' conduct that Corbin or anyone acting on her behalf provided to TBTA.

Counsel provided TBTA's attorneys with a more detailed draft complaint on January 27. MTA 56.1 ¶ 65; Pl. 56.1 Resp. ¶ 65. TBTA then began an internal investigation, conducting its first witness interview on February 1 and eventually interviewing fifteen witnesses, including

Corbin's identified witnesses, other women who worked with Ramos, BTOs who worked with both Corbin and Ramos, and Ramos himself. MTA 56.1, ¶ 66; Pl. 56.1 Resp., ¶ 66.

During his first investigative interview, Ramos denied Corbin's allegations and represented that he had exchanged only a few text messages with her. He stated that he no longer possessed the messages because he had obtained a new phone. MTA 56.1, ¶ 68; Pl. 56.1 Resp., ¶ 68. TBTA's initial investigation concluded that there was no reasonable cause to believe that Ramos had subjected Corbin to sexual harassment in violation of MTA policy. MTA 56.1, ¶ 69; Pl. 56.1 Resp., ¶ 69.

A year later, in January 2024, Corbin's counsel produced text messages exchanged between Corbin and Ramos. TBTA reopened its investigation and reinterviewed Ramos in February 2024. MTA 56.1, ¶¶ 70–71; Pl. 56.1 Resp., ¶¶ 70–71. Ramos acknowledged sending the messages, which contradicted his earlier representation that he had texted Corbin only three or four times. *Id.*

TBTA's amended investigation determined that there was reasonable cause to conclude that Ramos had violated MTA's Sexual and Other Discriminatory Harassment Policy, Equal Opportunity Policy, and Internal Discrimination Complaint Management Policy. The determination was based on the sexual nature of the text messages and on findings that Ramos had lied about the extent and nature of his communications with Corbin, had failed to disclose that he deleted messages, and had falsely denied engaging in sexual jokes. MTA 56.1, ¶ 72; Pl. 56.1 Resp., ¶¶ 72, 173. At his deposition in this action, Ramos admitted that he had lied to TBTA's investigators concerning the sexual nature of his relationship with Corbin. MTA 56.1, ¶ 76; Pl. 56.1 Resp., ¶ 76.

TBTA thereafter served Ramos with disciplinary charges alleging, among other things, misconduct, neglect of duty, poor judgment, unethical conduct, failure to cooperate, and conduct unbecoming a Bridge and Tunnel Sergeant. MTA 56.1, ¶ 73; Pl. 56.1 Resp., ¶ 73. Ramos resolved the charges by agreeing to a voluntary and irrevocable retirement. MTA 56.1, ¶ 74; Pl. 56.1 Resp., ¶ 74.

### F. Procedural History

Corbin commenced this action in March 2024 and filed a First Amended Complaint on April 22, 2024. Dkt. Nos. 1, 31. On May 2, 2025, the Court granted Corbin leave to correct certain factual allegations in light of her deposition testimony, and Corbin filed the operative Second Amended Complaint that same day. Dkt. Nos. 62, 64.

The operative Second Amended Complaint asserts the nine causes of action summarized above. Dkt. No. 64, ¶¶ 100–128. Ramos moved for summary judgment dismissing every claim asserted against him. Dkt. Nos. 76–79. The MTA Defendants separately moved for summary judgment dismissing every claim asserted against them. Dkt. Nos. 86, 89–91. Corbin opposed both motions, and Defendants filed replies. Dkt. Nos. 102–110. The motions are fully submitted.

## II. LEGAL STANDARD

Rule 56(a) provides that a party may move for summary judgment by "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought," and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Summary judgment therefore turns on whether the record presents "a sufficient disagreement to require submission to a jury" or is instead "so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The moving party bears the initial burden of identifying the basis for its motion and the portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But if the nonmoving party bears the burden of proof at trial, the movant need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Id.* Rather, the moving party may discharge its burden by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has carried its burden, the nonmoving party must come forward with evidence showing that there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Instead, it must point to evidence from which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 248. In assessing whether that showing has been made, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus.*, 475 U.S. at 587.

## III. DISCUSSION

### A. MTA and NYCTA Are Entitled to Summary Judgment Dismissing Counts One Through Seven Because Neither Was Corbin's Employer

Corbin's discrimination and retaliation claims against MTA and NYCTA – whether arising under federal, state or local law – depend on the existence of an employment relationship. *See Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006) ("[T]he existence of an

employer-employee relationship is a primary element of Title VII claims."). Although liability is not necessarily limited to the entity listed as the plaintiff's formal employer, a separate entity has to qualify as an employer under either the single-employer or joint-employer doctrine in order to be held liable.

Under the single-employer doctrine, nominally separate entities can be treated as a single enterprise based on "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226–27 (2d Cir. 2014) (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)). No single factor is determinative, but control of labor relations is the "central concern," and "[t]he central question" is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination[.]" *Id.* at 227 (quoting *Cook*, 69 F.3d at 1240).

The joint-employer doctrine by contrast, "assumes that [the employers] are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (quoting *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)). A separate entity can be liable as a constructive employer where it "shares in controlling the terms and conditions of a plaintiff's employment." *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022). Relevant considerations include "control over an employee's hiring, firing, training, promotion, discipline, supervision, and handling of records, insurance, and payroll." *Id.* at 838. The inquiry ultimately turns on "the element of control." *Id.* at 843 (quoting *Gulino*, 460 F.3d at 371).

The focus on control also applies to Corbin's claims under state and city law. Under the NYSHRL, the relevant considerations include "'(1) the selection and engagement of the servant;

(2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct,'" with the greatest weight placed on the right to order and control the employee's performance. *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017) (quoting *State Div. of Hum. Rts. v. GTE Corp.*, 109 A.D.2d 1082, 1083 (4th Dep't 1985)). Courts apply the single-employer framework to claims under the NYSHRL and NYCHRL as well. *See, e.g.*, *Cassard v. Omnicom Media Grp. Holdings, Inc.*, 2025 WL 3227617, at *3–4 (S.D.N.Y. Nov. 19, 2025) ("Courts have applied this same four-factor test to determine whether two or more entities constitute a 'single employer' under . . . the NYSHRL[] and the NYCHRL." (quoting *Juhua Han v. Kuni's Corp.*, 2020 WL 2614726, at *8 (S.D.N.Y. May 22, 2020))).

It is undisputed that TBTA hired Corbin as a BTO, remained her formal employer throughout her employment, and separated her from its employment in December 2022. It is also undisputed that MTA, NYCTA, and TBTA are legally distinct entities. Dkt. No. 106, ¶¶ 4, 6, 8–9. Their formal separateness does not itself resolve the employer inquiry, but Corbin has not produced evidence from which a reasonable jury could find that MTA or NYCTA exercised the necessary control over her employment.

As to MTA, Corbin relies on three categories of evidence. First, MTA maintained sexual-harassment, reasonable-accommodation, and ethics policies that applied to its affiliated agencies, including TBTA. Second, Joyce Brown, who had an MTA email address, handled accommodation requests from TBTA employees. Third, Richard Hildebrand testified that he held "two roles at the MTA and TBTA" – the civilian title of Vice President of Central Operations and the police title of Chief of Operations. Dkt. No. 106, ¶¶ 2, 99–102, 174–176; Dkt. No. 89-11, Hildebrand Dep. Tr. at 9:15–20.

Viewed in Corbin's favor, this evidence shows some administrative and managerial overlap between MTA and TBTA. It does not show the centralized control of labor relations required to treat the two entities as a single employer. The "central question" is which entity "made the final decisions regarding employment matters related to the person claiming discrimination." *Brown*, 756 F.3d at 227 (quoting *Cook*, 69 F.3d at 1240). In *Cook*, for example, the parent company processed employment applications, approved personnel-status reports, required the subsidiary to clear major employment decisions, and employed the officials who hired and fired the plaintiff. 69 F.3d at 1241. There is no comparable evidence here. Nothing in the record suggests that MTA processed Corbin's application, approved changes in her employment status, required TBTA to obtain approval for personnel decisions, or exercised authority over her hiring, assignment, compensation, leave status, or separation.

The fact that Hildebrand was associated with both TBTA and MTA does not fill the evidentiary gap. Whether he held both titles at both agencies or one title at each agency, the fact that he was associated with both agencies establishes at most that TBTA and MTA shared some common management. Corbin identifies no evidence that Hildebrand, acting on MTA's behalf, supervised her, controlled any term or condition of her employment, or participated in any decision concerning her assignment, accommodation, leave status, or separation. Nor is there evidence that his MTA position gave him authority over TBTA's labor relations more generally. The fact that he worked at both agencies, standing alone, therefore would not permit a reasonable jury to find that MTA controlled Corbin's employment.

Brown participated directly in addressing Corbin's medical restrictions and possible reassignment. Brown discussed Corbin's circumstances with Cassandra Edghill, TBTA's Assistant Vice President of Operations, and Eduardo Miyashiro, TBTA's Deputy Chief of Labor

Relations; spoke with Corbin about a possible reassignment; and sent her a new accommodation form. Dkt. No. 90, ¶¶ 50, 53–58. Although Brown used an email address ending in "mtahq.org," her signature block identified her as the Chief Equal Opportunity Officer in the Triborough Bridge and Tunnel Authority's Department of Diversity and Inclusion, and it is undisputed that Brown was TBTA's Chief EEO Officer. Dkt. No. 89-34, Brown-Corbin Email, TBTACORBIN_0002488. Her actions were also undertaken with identified TBTA officials and concerned whether Corbin could continue working in her TBTA position or be reassigned to another position within TBTA. The record does not establish whether the MTA email domain was used generally by employees of affiliated agencies. But even drawing the inference most favorable to Corbin – that the address reflects shared administrative platform – the domain does not establish that MTA employed or supervised Brown. Corbin identifies no evidence that anyone acting for MTA directed Brown's handling of her request, approved any recommendation Brown made, or otherwise exercised authority over the accommodation process.

The remaining evidence likewise attributes the material employment decisions to TBTA. TBTA hired Corbin, assigned and supervised her, administered the BTO bidding process, determined that no desk assignment was then vacant, returned her to IOD leave, and ultimately separated her from employment. *See* Dkt. No. 106, ¶¶ 8–9, 42–64. Corbin identifies no evidence that MTA paid her, maintained her personnel records, controlled her schedule or assignments, disciplined her, determined her leave status, or participated in her separation. Nor is there evidence that TBTA required MTA's approval before making any of those decisions. The shared email domain and Brown's participation therefore do not alter the conclusion that TBTA, rather than MTA, controlled the labor relations and made the employment decisions relevant to Corbin.

Corbin's evidence is also insufficient under the joint-employer doctrine. That doctrine requires proof that MTA exercised "significant control" over the terms and conditions of Corbin's employment. *Felder*, 27 F.4th at 844–45. It is not enough to show "operational control or supervision over the plaintiff's formal employer." *Moody v. Empire Hotel Development, Inc.*, 2023 WL 5480729, at *5 (S.D.N.Y. Aug. 24, 2023). In *Moody*, the court granted summary judgment for defendants because corporate training did not establish a joint-employer relationship where the formal employer hired the plaintiffs, fixed their pay, controlled their schedules and daily work, maintained their employment records, administered discipline, and made the relevant employment decisions. *Id.* at *5–6. The court in *Rivers v. International House of Pancakes*, 2021 WL 860590, at *2–3 (S.D.N.Y. Mar. 8, 2021) reached a similar conclusion at the pleading stage. There, Trihop was the plaintiff's formal employer, while IHOP prescribed detailed workplace protocols and inspected Trihop's compliance with them. Because the plaintiff did not allege that IHOP controlled hiring and firing, work schedules, compensation, employment records, or working conditions, the court found "nothing from which [it could] infer that IHOP had control over, knew of, or had reason to know of Trihop's employment actions with respect to Plaintiff." *Rivers*, 2021 WL 860590, at *2–3.

Here, even after discovery, Corbin has produced no evidence that MTA exercised significant control over her employment. The fact that MTA promulgated policies applicable to TBTA, that Brown used an MTA-domain email address, and that some personnel held overlapping titles may demonstrate institutional coordination. But none of those facts shows that MTA possessed or exercised authority to hire, fire, supervise, discipline, compensate, or otherwise control Corbin. They therefore do not create a triable issue of joint employment.

Thus, whether analyzed under the single-employer or joint-employer doctrine, Corbin's evidence shows institutional affiliation but not the requisite control. No reasonable jury could find that MTA either centrally controlled TBTA's labor relations or shared significant control over Corbin's employment.

The case against NYCTA is even weaker. Corbin identifies no NYCTA employee who supervised her, participated in the accommodation process, administered her transfer or assignment bids, determined her IOD status, or had any role in her separation. The fact that certain MTA policies also applied to NYCTA does not make NYCTA the employer of a TBTA employee.

Corbin's reliance on *New York Urban League, Inc. v. State of New York*, 71 F.3d 1031 (2d Cir. 1995), does not alter that conclusion. That case involved a Title VI challenge to the allocation of transportation funding and proposed fare increases. *See id.* at 1033 (describing the "narrow question" on appeal as whether the plaintiffs had shown entitlement to preliminary relief "barring the MTA from imposing the fare increase on the NYCTA lines"). It neither involved an employment relationship nor held that MTA, NYCTA, and TBTA constitute a single employer for purposes of employment-discrimination law.

Because no reasonable jury could find that MTA or NYCTA employed Corbin – formally, jointly, or as part of a single integrated enterprise – MTA and NYCTA are entitled to summary judgment dismissing Counts One through Seven. These claims are therefore DISMISSED as against MTA and NYCTA.

**B. TBTA Is Entitled to Summary Judgment Dismissing Corbin's Disability-Discrimination Claims, Whether Asserted Under the ADA, NYSHRL, or the NYCHRL (Counts Two, Four, and Six)**

1. Applicable Law

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability," including by failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(a), (b)(5)(A). A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.*, § 12111(8).

To establish a failure-to-accommodate claim under the ADA, a plaintiff must show that "(1) [she] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Tafolla v. Heilig*, 80 F.4th 111, 118–19 (2d Cir. 2023) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

Whether a function is essential requires a "fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Id.* at 119 (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)). Relevant considerations include "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." *Id.* (quoting *McMillan*, 711 F.3d at 126). "The term 'essential functions' . . . mean[s] the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Id.* (quoting *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)).

Under this standard, "a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position," while recognizing that "A reasonable accommodation can never involve the elimination of an essential function of a job." *Id.* (quoting *Shannon v. N.Y.C. Transit Authority*, 332 F.3d 95, 100 (2d Cir. 2003)).

The NYSHRL likewise requires an employer to provide reasonable accommodations that would permit an employee with a disability to perform, "in a reasonable manner," the activities involved in the job, unless the accommodation would impose an undue hardship. N.Y. Exec. Law §§ 292(21), (21-e), 296(3). Under the NYCHRL, the employer bears the burden of establishing as an affirmative defense that the employee could not, with reasonable accommodation, "satisfy the essential requisites of the job." N.Y.C. Admin. Code § 8-107(15)(b); *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885 (2013) (holding that "the employer, not the employee," must prove that the employee could not perform the essential requisites of the job with an accommodation).

2. TBTA Did Not Fail to Provide Corbin Reasonable Accommodation

It is undisputed that Corbin had a disability and that TBTA knew about it. Her failure-to-accommodate claim fails for two independent reasons. First, the accommodation proposed by Corbin was not reasonable, since it would have eliminated essential functions of the patrol assignment she obtained. Second, the record identifies no vacant alternative position that TBTA denied her.

Carrying a firearm and lifting more than ten pounds were essential functions of the 11:00 p.m. patrol assignment Corbin obtained. She remained medically restricted from performing both functions. *See supra* Section I(D). The BTO job description requires officers to maintain their firearms qualification and identifies patrol, emergency-response, traffic-control, security, and law-

enforcement duties as core responsibilities. Dkt. No. 107-7, BTO Job Description, TBTACORBIN_0001668–70. Hildebrand similarly testified that an officer subject to Corbin's restrictions "[c]annot be on patrol." Patrol officers must carry firearms, their equipment alone weighs at least ten pounds, and their duties may require them to assist motorists or remove debris from a roadway. Dkt. No. 89-11, Hildebrand Dep. Tr. at 29:2–21, 33:4–15. Together, the job description and the evidence concerning how patrol work is actually performed establish that both functions were fundamental duties of Corbin's assigned patrol position.

Corbin's prior light-duty arrangement does not create a factual dispute about whether those functions were fundamental to a patrol assignment. While Plaintiff retained the BTO title between October 2021 and November 2022, and while she remained assigned to the FETF, the work she actually performed was either administrative or desk-related. She did not patrol roadways, carry a firearm, respond to emergencies, or perform the other operational duties of a patrol assignment. *See supra* Section I(B). She could not do those things, because she could not carry a gun or wear the necessary equipment. All this arrangement shows is that TBTA temporarily structured Corbin's FETF duties around her medical restrictions. It does not mean that carrying a weapon and more than 10 pounds of equipment were not *bona fide* qualifications for performing the duties of a BTO patrol officer.

Giving Corbin the patrol assignment for which she successfully bid while continuing to assign her only duties that did not require carrying a firearm or patrol equipment would have removed the essential patrol functions from Corbin's new assignment. Corbin was effectively proposing to convert a patrol assignment into a nonpatrol position. The ADA does not require TBTA to make that change. *See Stevens v. Rite Aid Corp.*, 851 F.3d 224, 230 (2d Cir. 2017) ("[T]he issue is whether a reasonable accommodation would have enabled [the employee] to

perform that essential function, not whether . . . he could perform his other duties." (emphasis added)).[1]

*Stone* involved materially different evidence. The fire department in *Stone* maintained two established light-duty bureaus whose incumbents had never been required to perform the allegedly essential fire-suppression function. 118 F.3d at 99–100. TBTA, by contrast, maintained two identified nonpatrol BTO assignments – Desk Officer and Clerk – and distinguished those assignments from patrol positions. Dkt. No. 89-11, Hildebrand Dep. Tr. at 25:9–21. Corbin's temporary performance of administrative duties within the FETF does not establish that TBTA maintained an administrative version of the patrol assignment she obtained.

Corbin also fails to identify a vacant position that TBTA denied her. A plaintiff seeking reassignment must identify, "at or around the time when accommodation was sought," an existing vacant position for which she was qualified. *McBride*, 583 F.3d at 97–98. A generalized assertion that reassignment was possible does not satisfy that burden. *Id.* at 97.

The record establishes that no vacant desk assignment was available on December 1, 2022. Corbin told Brown that she believed two desk positions were vacant, but she neither identifies what those positions were nor establishes that any such positions were available. *See supra* Section I(D). Moreover, TBTA was not required to bypass its established bidding and seniority

[1] The United States Equal Employment Opportunity Commission's ("EEOC") nonbinding enforcement guidance addresses temporary light-duty positions and reassignment separately. Question 29 explains that an employer is "free to determine that a light duty position will be temporary rather than permanent" and therefore may limit light-duty work to a temporary period. U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Workers' Compensation and the ADA*, Question 29 (Sept. 3, 1996). Question 22 directs an employer to reassign an employee who cannot perform the original position to an available equivalent position for which the employee is qualified, absent undue hardship, or to an available lower-level position if no equivalent vacancy exists. *Id.*, Question 22. Question 23 confirms that the ADA "does not require an employer to create a new position" or displace another employee to provide a reassignment. *Id.*, Question 23. Corbin's prior temporary arrangement therefore did not require TBTA to preserve administrative work for her after she transferred from the FETF and obtained a patrol assignment. TBTA was required to consider existing vacancies, and the record identifies no vacancy that it denied her.

procedures. An accommodation that conflicts with an established seniority system is ordinarily unreasonable absent special circumstances. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 403, 405–06 (2002). Corbin identifies no special circumstance warranting an exception here.

TBTA also took concrete steps to identify a workable accommodation. Before returning Corbin to IOD leave, TBTA officials met to discuss her situation and concluded that she "should be offered to engage in the interactive ADA process including and up to reassignment." Dkt. No. 107-16, 2022 Activity Log, TBTACORBIN_0000745. The activity log reflects that the officials specifically discussed an upcoming secondary bid for a desk assignment as an "option to avoid termination." *Id.* On December 1, Brown discussed Corbin's restrictions with her, explained that TBTA would first assess accommodation within her assigned position and then search for a vacant alternative, encouraged her to update her résumé, and sent her a new reasonable-accommodation form. *Id.*, TBTACORBIN_0000746. Corbin never returned the form. Dkt. No. 106, ¶ 58. TBTA then advised her of the secondary desk bid, which Corbin also declined to pursue. The record therefore shows that TBTA considered both accommodation within Corbin's assigned position and reassignment to a nonpatrol position.

The circumstances surrounding the secondary bid do not permit a finding that TBTA denied Corbin a reasonable accommodation. On December 15 and 16, TBTA advised Corbin that she could submit a secondary bid for an RFK desk assignment scheduled to begin on December 29. Dkt. No. 90, ¶¶ 60–61. On December 16, Corbin told a friend that she intended to decline the opportunity, explaining, "I can't go back, lawsuit or not. . . . I never wanted desk. The schedule not good." Dkt. No. 89-37, Corbin-Dee Text Messages, 0409. She formally declined to submit a bid on December 18. Dkt. No. 106, ¶ 63. TBTA did not send its letter notifying Corbin that she

would be separated effective December 28 until December 20 – two days after she declined the bid. Dkt. No. 107-8, Final Termination Letter, TBTACORBIN_0000153.

Corbin is correct that the desk assignment was scheduled to begin one day after the date ultimately fixed for her separation. But, as explained above, Civil Service Law § 71 did not make separation on December 28 automatic; it authorized TBTA to separate her after she had received the statutorily guaranteed leave. When TBTA invited Corbin to bid, it had not yet notified her of a definitive decision to exercise that authority. To the contrary, its internal activity log identified the desk bid as a possible means of avoiding termination. Had Corbin bid for and obtained the position, TBTA remained legally free to defer her separation so that she could begin the assignment. By declining to bid, Corbin foreclosed any need for TBTA to decide whether to do so. A jury therefore could not find that the December 29 start date made the bid futile or that TBTA denied Corbin a position she chose not to seek.

Nor does Corbin's later testimony that she declined because of the one-day discrepancy create a genuine dispute. She had not yet received the December 20 termination letter when she refused to bid, and her contemporaneous message identified different reasons: she did not want a desk position, disliked its schedule, and had decided that she could not return to TBTA. This evidence is consistent with her testimony that she wanted to retain a patrol assignment so that she could eventually return to full patrol duty, rather than accept an administrative position that would permanently avoid the functions she could not perform. *See* Dkt. No. 106, ¶¶ 146, 163. But the ADA did not require TBTA to preserve Corbin's status as a patrol officer while permanently excusing her from the essential functions of patrol work. TBTA offered her an opportunity to compete for the type of nonpatrol assignment that accommodated her restrictions; Corbin declined because that was not the job she wanted.

TBTA is also entitled to summary judgment dismissing Corbin's reasonable-accommodation claims under the NYSHRL and NYCHRL. Under those statutes, an employer seeking summary judgment ordinarily must show that it participated in "a good faith interactive process that assesse[d] the needs of the disabled individual and the reasonableness of the accommodation requested." *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 837 (2014) (internal quotation marks omitted). The NYCHRL also places on TBTA the burden of proving that Corbin could not, with reasonable accommodation, satisfy the essential requisites of the job. N.Y.C. Admin. Code § 8-107(15)(b); *Romanello*, 22 N.Y.3d at 885.

TBTA has carried those burdens. Its officials evaluated Corbin's ability to perform the patrol assignment, reviewed the availability of nonpatrol positions, discussed reassignment with her, sent her the necessary accommodation form, and advised her of the secondary bid. The undisputed medical restrictions prevented Corbin from satisfying the essential requisites of the patrol assignment. And the record does not show that TBTA denied her a vacant alternative position. The positions Corbin initially identified were not shown to be available, while she declined to compete for the later desk assignment that TBTA brought to her attention. TBTA is therefore entitled to summary judgment dismissing Corbin's failure-to-accommodate claims under the ADA, NYSHRL, and NYCHRL.

3. Corbin Has Not Shown That Her Termination Was Discriminatory

Corbin also alleges that TBTA terminated her because of her disability. ADA discriminatory-discharge claims are evaluated under the *McDonnell Douglas* framework. The plaintiff must establish a *prima facie* case, the employer must offer a legitimate nondiscriminatory reason, and the plaintiff must produce evidence that the stated reason is pretextual. *McBride*, 583

F.3d at 96. The ADA ultimately requires proof that disability discrimination "was the but-for cause" of the adverse action. *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).

Even assuming that Corbin could establish a *prima facie* case, TBTA has articulated a legitimate reason for her separation. She had accumulated 365 days of IOD leave arising from the same occupational injury and remained unable to perform patrol work when that period expired. TBTA's December 20 letter stated that her employment would end effective December 28 pursuant to Civil Service Law § 71 and noted that TBTA had warned her of that possibility in 2021. Dkt. No. 107-8, Final Termination Letter, TBTACORBIN_0000153. Those warnings long predated the accommodation discussions on which Corbin relies.

As explained above, § 71 guaranteed Corbin at least one year of leave and authorized – but did not require – TBTA to separate her after she exhausted that minimum period. *See supra* Section I(D). Corbin received the leave guaranteed by the statute and remained medically unable to perform the essential functions of her patrol assignment when that period expired. Section 71 therefore supplied TBTA with a lawful basis for separating her, even though TBTA retained discretion to defer or forgo separation. *See Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 195 (S.D.N.Y. 2006) (explaining that § 71 "permits a civil service employer to terminate an employee who has been separated from service for more than one year by reason of disability resulting from an occupational injury").

Corbin has not produced evidence from which a jury could find that TBTA's reliance on her exhaustion of the leave guaranteed by § 71 and her continuing inability to perform patrol work was false or that disability bias motivated the decision. Her argument largely reprises the accommodation theories rejected above. *See supra* Section III(B)(2). Although § 71 authorized rather than required her immediate separation, an employer's possession of discretion does not,

standing alone, permit an inference that it exercised that discretion discriminatorily. Corbin identifies no evidence that TBTA invoked § 71 as a pretext, applied it differently to similarly situated employees, or otherwise elected to separate her because of disability bias. *See Bresloff-Hernandez v. Horn*, 2007 WL 2789500, at *6 (S.D.N.Y. Sept. 25, 2007) ("No presumption of discrimination arises when an employer makes a decision explicitly provided for by the Civil Service Law.").

Indeed, the chronology supports the opposite inference. Before TBTA sent the December 20 termination letter, its officials identified the forthcoming secondary bid for a desk assignment as an "option to avoid termination" and invited Corbin to submit a bid. Corbin declined on December 18, explaining contemporaneously that she did not want a desk position and disliked its schedule. Only two days later did TBTA notify her that it would exercise its authority under § 71 and separate her effective December 28. Because § 71 did not mandate separation on that date, TBTA remained free to defer or forgo separation had Corbin bid for and obtained the desk assignment scheduled to begin on December 29. Corbin's refusal to bid meant that TBTA never had occasion to decide whether to preserve her employment so that she could assume that position. Far from suggesting disability bias, TBTA's invitation to pursue a nonpatrol position that accommodated her restrictions shows that it was attempting to identify a means of retaining her before electing to separate her.

The same evidence defeats Corbin's discriminatory-termination claims under the NYSHRL and NYCHRL. Even under the NYCHRL's more liberal standard, no evidence would permit a jury to find that disability bias played any role in TBTA's decision. The undisputed record instead shows that TBTA relied on Corbin's accumulated IOD leave, her continuing inability to perform patrol work, and her decision not to pursue the available desk assignment.

Accordingly, TBTA is entitled to summary judgment dismissing Count Two and the disability-discrimination components of Counts Four and Six.

### C. TBTA Is Entitled to Summary Judgment Dismissing Corbin's Retaliation Claims Under the ADA, NYSHRL, and NYCHRL (Counts Three, Five, and Seven)

Corbin invokes three retaliation statutes. Each claim requires separate analysis because the statutes differ in their treatment of both protected activity and causation.

1. ADA Retaliation

A request for reasonable accommodation is protected activity under the ADA. ADA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)). A plaintiff must first establish that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that [she] was involved in protected activity; (iii) an adverse decision or course of action was taken against [her]; and (iv) a causal connection exists between the protected activity and the adverse action." *Id.* (quoting *Natofsky*, 921 F.3d at 353). If the employer offers a legitimate, nonretaliatory reason for the challenged action, the plaintiff must produce evidence from which a reasonable jury could find that the protected activity was a but-for cause of that action. *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) ("To prove a causal connection, a plaintiff must show that 'but for' the protected activity, the adverse action would not have been taken.").

Corbin contends that TBTA returned her to IOD leave and later fired her because she sought to continue working subject to her existing medical restrictions. TBTA disputes that she requested an accommodation in connection with the November 2022 transfer, emphasizing that she never completed the reasonable-accommodation form Brown sent her. *See* Dkt. No. 106, ¶¶

55–58. Corbin testified, however, that she sought to transfer while retaining the temporary light-duty arrangement under which she had been working. *Id.*, ¶¶ 143, 147. Viewing the record in her favor, the Court assumes that Corbin requested an accommodation and that TBTA understood the request. She therefore engaged in protected activity under the ADA.

But Corbin has not shown that the request caused either challenged action. Her 2021 accommodation request supports no inference of retaliation. TBTA responded by returning her to work in an administrative assignment, and more than a year elapsed before it returned her to IOD leave or terminated her employment. *See supra* Section I(B).

The November 2022 request occurred much closer to those actions. This temporal proximity might satisfy Corbin's minimal burden of establishing causation at the *prima facie* stage, but TBTA has established legitimate, nonretaliatory reasons for its decisions. Corbin remained medically unable to perform the essential functions of the patrol assignment she obtained, she had declined to bid on the only available nonpatrol assignment that was identified, and she was approaching the exhaustion of the minimum leave guaranteed by Civil Service Law § 71, after which the statute authorized TBTA to separate her. *See supra* Sections III(B)(2)–(3).

The record contains no evidence that those reasons concealed retaliation. Corbin identifies no retaliatory statement, shifting explanation, procedural departure, or similarly situated employee who received more favorable treatment. Her proof of pretext rests on timing alone. "[T]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Timing may support pretext when accompanied by evidence such as "inconsistent employer explanations," *id.*, but no such evidence appears here.

*Tafolla* and *Sohnen* illustrate why the evidence Corbin needs is missing here. In *Tafolla*, the supervisor responded hostilely to the accommodation request, and record evidence contradicted the employer's assertion that no light-duty assignments existed. 80 F.4th at 126–27. In *Sohnen v. Charter Communications, Inc.*, 2022 WL 900602, at *11 (E.D.N.Y. Mar. 28, 2022), the employer offered inconsistent explanations, and the employee produced evidence undermining its asserted justification. No TBTA official expressed hostility toward Corbin's request, and TBTA's explanation has remained consistent with her undisputed medical restrictions, the requirements of the patrol assignment, and her accumulated IOD leave. No reasonable jury could find that TBTA would have retained Corbin in active employment but for her request for an accommodation. The ADA retaliation claim therefore fails.

2. NYSHRL Retaliation

Corbin's NYSHRL retaliation claim fails at the threshold because her accommodation request was not protected activity under the version of the statute in effect at the time this lawsuit was filed.

At the time Corbin commenced this case, Executive Law § 296(7) prohibited retaliation against a person who had "opposed any practices forbidden under this article" or "filed a complaint, testified or assisted in any proceeding under this article." The statute did not expressly protect a request for reasonable accommodation. The Appellate Division has held that "a request for a reasonable accommodation does not constitute a protected activity under the NYSHRL." *Voltaire v. Northwell Health, Inc.*, 2026 N.Y. Slip Op. 03841, at 2 (2d Dep't June 17, 2026); *accord D'Amico v. City of New York*, 159 A.D.3d 558, 558–59 (1st Dep't 2018).

The Legislature amended § 296(7) in December 2025 to provide expressly that requesting a reasonable accommodation constitutes protected activity. The amendment took effect on

December 5, 2025, but applies only to actions commenced on or after that date. 2025 N.Y. Laws ch. 600, §§ 3–4. Corbin commenced this action in March 2024, so the pre-amendment version of § 296(7) governs her claim. Under that version, her request for an accommodation was not protected activity. Because she identifies no other protected activity that occurred before TBTA returned her to IOD leave or terminated her employment, she cannot establish the threshold element of an NYSHRL retaliation claim. The claim therefore fails as a matter of law.

3. <u>NYCHRL Retaliation</u>

The NYCHRL expressly prohibits retaliation because a person "requested a reasonable accommodation." N.Y.C. Admin. Code § 8-107(7)(v). It also reaches a broader range of arguably retaliatory conduct than the ADA. The challenged action need only be "reasonably likely to deter a person from engaging in protected activity." *Id.*, § 8-107(7). The plaintiff must still establish causation by showing that the challenged conduct was "caused at least in part by . . . retaliatory motives." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015) (quoting *Mihalik v. Crédit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013)).

Corbin's assumed November 2022 accommodation request was protected activity under the NYCHRL. Returning her to IOD leave and terminating her employment were also reasonably likely to deter an employee from requesting an accommodation. The claim therefore turns on whether retaliatory motive contributed to either decision.

No reasonable jury could make that finding. Corbin obtained a patrol assignment whose essential functions she remained medically unable to perform. TBTA determined that no vacant desk assignment was then available, discussed accommodation and reassignment with her, sent her a new accommodation form, and later advised her of a secondary desk bid. She was also approaching the exhaustion of the minimum leave guaranteed by § 71, after which the statute

authorized – but did not require – TBTA to separate her. *See supra* Sections I(B), I(D), and III(B)(2)–(3).

Corbin identifies no statement, procedural irregularity, inconsistent explanation, or comparator evidence suggesting that TBTA acted to punish her for seeking an accommodation. The close timing shows that the request and the challenged actions occurred during the same accommodation process. Without additional evidence of retaliatory motive, this timing does not permit an inference that retaliation contributed to either decision. *See Ya-Chen Chen*, 805 F.3d at 76–77. The undisputed timeline instead shows that TBTA applied preexisting job requirements and acted at the previously identified point when § 71 permitted separation while attempting to find an assignment Corbin could perform. Corbin's NYCHRL retaliation claim therefore fails.

Accordingly, TBTA is entitled to summary judgment dismissing Corbin's ADA retaliation claim in Count Three, her NYCHRL retaliation claim in Count Five, and her NYSHRL retaliation claim in Count Seven.

### D. A Jury Could Find TBTA Negligent in Permitting Corbin's Alleged Hostile Work Environment (Count One)

Title VII makes it unlawful for an employer to discriminate against an employee with respect to the "terms, conditions, or privileges of employment" because of sex. 42 U.S.C. § 2000e-2(a)(1). To prevail on a hostile-work-environment claim, a plaintiff must show both "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted). Whether an environment is hostile depends on "all the circumstances," including the frequency and severity of the conduct, whether it was physically threatening or humiliating, and whether it interfered with the employee's work. *Redd*

*v. N.Y. State Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Although isolated incidents ordinarily do not suffice, "a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'" *Id.* at 175–76.

For purposes of this motion, there is no need to perseverate over the first requirement. Corbin testified that Ramos repeatedly directed sexual comments and unwanted touching toward her and, on several occasions in 2022, exposed himself, groped her, and coerced her into sexual conduct in the workplace. Dkt. No. 107-1, Corbin Dep. Tr. at 268:4–279:13; Dkt. No. 106, ¶¶ 123–26. Ramos maintains that their sexual interactions were consensual. That factual dispute certainly cannot be resolved on summary judgment. If a jury credited Corbin's account, it could readily find hostile conduct that was sufficiently severe or pervasive to alter the conditions of her employment.

The remaining question is whether the record supplies a basis for imputing Ramos's alleged conduct to TBTA.

An employer's liability for harassment depends on the harasser's status. An employee is a supervisor for purposes of Title VII vicarious liability only if the employer empowered him "to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013). A tangible employment action is one effecting a "significant change in employment status," such as hiring, firing, failing to promote, reassigning an employee to significantly different responsibilities, or making a decision causing a significant change in benefits. *Id.* at 431 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Thus, "The ability to direct another employee's tasks is simply not sufficient" to confer supervisor status. *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019) (quoting *Vance*, 570 U.S. at 439).

Ramos was not Corbin's supervisor under this standard. As summarized in Section I(A), Ramos exercised some authority over BTOs, but he lacked authority to take any tangible employment action against Corbin. He could not hire or fire her, promote or demote her, set her compensation or regular tour, evaluate her performance, or impose discipline carrying economic consequences. Dkt. No. 90, ¶¶ 79–95. His limited authority over daily assignments, breaks, completed overtime, and workplace write-ups is insufficient under *Vance*. *See* 570 U.S. at 439, 450.

Corbin's belief that Ramos's rank and popularity enabled him to influence upper management does not create a genuine dispute about his supervisor status. That status turns on authority actually conferred by the employer – not on the victim's subjective perception of the harasser's influence. To survive summary judgment, Corbin had to identify evidence that TBTA authorized Ramos "to do more than oversee her day-to-day performance of assigned tasks" and empowered him to take employment actions "that could inflict direct economic injury." Bentley, 935 F.3d at 91. She has identified no such evidence.

Nor is there evidence that TBTA routinely relied on Ramos's recommendations when making tangible employment decisions concerning Corbin. Ramos did not participate in the bidding process, Corbin's placement on IOD leave, the accommodation discussions, or the decision to separate her after she exhausted the leave guaranteed by Civil Service Law § 71. *See* Dkt. No. 90, ¶¶ 42–64, 98.

Ramos was therefore a co-worker for purposes of Title VII, and TBTA may be held liable for his alleged conduct "only for its own negligence." *Duch*, 588 F.3d at 762 (internal quotation marks omitted). A plaintiff may establish such negligence by showing that the employer "provided no reasonable avenue of complaint" or that it "knew, or in the exercise of reasonable care should

have known, about the harassment yet failed to take appropriate remedial action." *Id.* at 762–63 (internal quotation marks omitted). The latter theory requires evidence that "(1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Id.* at 763.

The record does not permit a finding that TBTA provided no reasonable avenue of complaint. TBTA provided multiple avenues through which Corbin could report harassment. Its sexual-harassment policy allowed an employee to report conduct to a supervisor or manager, a departmental EEO officer, the Chief EEO Officer, or a designated hotline. TBTA distributed the policy, made it available to employees, and provided annual training. Dkt. No. 90, ¶¶ 99–105. Corbin was also in direct contact with Chief EEO Officer Joyce Brown during November and December 2022 but did not tell Brown that Ramos was harassing her or that her transfer bid was intended to avoid him. *Id.*, ¶ 56.

Corbin did eventually report Ramos – but she did not report him to TBTA until after her employment ended. She did not report him to anyone while she was on duty at TBTA. On December 16, 2022 – after she had been returned to IOD leave – Corbin reported Ramos to the NYPD. Dkt. No. 106, ¶ 161. Her decision to report a co-worker to an outside law-enforcement agency confirms the seriousness with which she regarded Ramos's conduct, but it does not show that TBTA lacked a reasonable avenue of complaint. Corbin's testimony that supervisors had failed to address an earlier complaint about workplace bullying may explain her reluctance to report Ramos internally, but that earlier complaint concerned a different employee, did not involve sexual harassment, and there is no evidence that Corbin either presented that complaint to the EEO office or used the hotline. The relevant inquiry is whether TBTA "provided no reasonable avenue

of complaint." *Duch*, 588 F.3d at 763 (emphasis in original). On this record, no reasonable jury could so find.

There is, however, a triable issue as to whether TBTA had constructive notice of at least some of Ramos's alleged conduct through Sergeant Anthony Volpe. Corbin did not report Ramos through any of TBTA's internal channels or to her union. Dkt. No. 106, ¶¶ 37, 41. But an employer can have constructive notice even without a formal complaint if an employee charged with a duty to act or report observed enough to know, or reasonably should have known, that harassment was occurring. *See Duch*, 588 F.3d at 763.

Volpe was not merely a fellow BTO. He held the rank of Sergeant. Ramos testified that sergeants who observed workplace conduct that could constitute sexual harassment – including inappropriate touching or kissing – were required to report it. Dkt. No. 106, ¶ 132; Dkt. No. 111, ¶ 132. Thus, if Volpe observed conduct that reasonably suggested sexual harassment, his knowledge could be imputed to TBTA. *See Duch*, 588 F.3d at 763 (explaining that an employee's knowledge is imputable where the employee is "charged with a duty to act on the knowledge and stop the harassment" or "with a duty to inform the company of the harassment" (quoting *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997))).

Corbin testified that Volpe "would have overseen or should have noticed" Ramos attempting to hug or touch her. Dkt. No. 107-1, Corbin Dep. Tr. at 64:19–65:4. That testimony is less definite than her counterstatement's assertion that Volpe actually witnessed particular incidents. And the more specific allegations – that Volpe heard Ramos ask about Corbin's sex life and saw Ramos block her exit while demanding a hug – appear in Corbin's unverified pleading and in an internal report summarizing her draft complaint. *See* Dkt. No. 64, ¶¶ 35, 55; Dkt. No.

106, ¶¶ 134–35. The Second Amended Complaint is signed only by counsel and is not verified by Corbin; its allegations therefore do not themselves constitute evidence at summary judgment.

But the Court need not rely on the unverified pleading to find a factual dispute. Viewing Corbin's deposition testimony in the light most favorable to her, a jury could understand her statement that Volpe "would have overseen or should have noticed" Ramos's attempts to hug or touch her as testimony that Volpe was present, was in a position to observe that conduct, and failed to act despite his reporting responsibility. Volpe denied during TBTA's investigation that he witnessed any inappropriate comments, touching, hugging, or other sexual conduct involving Corbin and Ramos. Dkt. No. 111, ¶¶ 133–35. Whether Volpe observed the conduct, what the conduct would have conveyed to a reasonable supervisor, and whether his failure to report it was unreasonable are therefore disputed questions of fact.

*Duch* involved more extensive evidence of notice than appears here. There, the plaintiff sought a schedule change to avoid the harasser; the harasser admitted that he might have acted improperly; the supervisor knew of the harasser's prior sex-related misconduct; the plaintiff became visibly emotional when questioned; and the supervisor instructed the harasser to "cut it out" while discouraging the plaintiff from explaining what had occurred. 588 F.3d at 765–66. But *Duch* does not establish a minimum factual checklist. The governing question remains whether someone whose knowledge may be imputed to the employer knew or reasonably should have known of the harassment. *Id.* at 763. Because Volpe was a sergeant with an acknowledged reporting duty and Corbin testified that he should have observed Ramos attempting to hug or touch her, the Court cannot resolve that question as a matter of law.

Corbin also testified that BTO Octavio Barrios was present when Ramos made a comment about her breasts. Dkt. No. 107-1, Corbin Dep. Tr. at 65:24–66:7. But Barrios was a fellow officer,

and Corbin identifies no evidence that he was "charged with a duty to act on the knowledge and stop the harassment" or "a duty to inform the company of the harassment." Duch, 588 F.3d at 763 (quoting Torres, 116 F.3d at 636–37). His alleged presence for one sexual comment therefore does not independently impute notice of Ramos's asserted course of conduct to TBTA.

The later chronology does not supply a separate basis for finding that TBTA permitted harassment to continue after receiving direct notice. Corbin reported Ramos to the NYPD on December 16, 2022, and described her allegations to a detective four days later. Dkt. No. 106, ¶¶ 161–62. Her report to the NYPD – a separate law-enforcement agency – did not constitute notice to TBTA, a separate entity.

On December 22, however, NYPD Special Victims Detective Lauren Liebhauser informed Jose Pena, a senior investigator in the MTA Inspector General's Office, of Corbin's allegations. Dkt. No. 111, ¶ 164. Pena stated that he would consult his supervisors regarding whether the Office would open a case, but the Office neither opened an investigation nor sent the allegations to TBTA's human-resources or EEO personnel before Corbin's employment ended on December 28. *Id.*, ¶¶ 164–67. As discussed above, MTA and TBTA are separate entities. The first evidence of a direct report to TBTA appears in January 2023, when Corbin's attorneys served a notice of claim and provided a draft complaint.

Even assuming that Pena's knowledge is imputable to TBTA, the December 22 notice does not create an additional triable issue concerning TBTA's response after that date. Corbin had been out of the workplace on IOD leave since December 1, and the December 20 letter had already notified her that her employment would end on December 28. There is no evidence that she returned to work, encountered Ramos, or experienced any further harassment after Pena received

the report. The six-day period between the December 22 communication and Corbin's separation therefore did not permit Ramos's alleged harassment of Corbin to occur or continue.

TBTA received direct notice of Corbin's allegations only after her employment had ended. Her attorneys served TBTA with a notice of claim on January 6, 2023, and provided a detailed draft complaint on January 27. Dkt. No. 106, ¶ 168. TBTA then commenced an internal investigation and conducted its first witness interview on February 1. *Id.*, ¶¶ 66, 169. The initial investigation found no reasonable cause to conclude that Ramos had sexually harassed Corbin. *Id.*, ¶ 169. After Corbin's counsel produced text messages between Corbin and Ramos in January 2024, TBTA reopened the investigation and reinterviewed Ramos. *Id.*, ¶¶ 170–71.

The amended investigation found reasonable cause to conclude that Ramos had violated MTA's Sexual and Other Discriminatory Harassment Policy, Equal Opportunity Policy, and Internal Discrimination Complaint Management Policy. *Id.*, ¶¶ 72, 173. That determination rested on the sexual nature of the text messages and on findings that Ramos had misrepresented the extent and nature of his communications with Corbin. *Id.* The amended report separately found Corbin's allegations of physical touching and forced sexual conduct unsubstantiated. These administrative findings are not findings of this Court and do not resolve the parties' conflicting testimony about whether their sexual encounters were consensual. TBTA thereafter brought disciplinary charges against Ramos, and Ramos resolved those charges by agreeing to an irrevocable retirement. *Id.*, ¶¶ 73–74.

These events demonstrate that TBTA acted after receiving Corbin's detailed allegations and supporting messages. They neither establish nor foreclose whether TBTA previously had constructive notice through Sergeant Volpe. This earlier question must be resolved by the jury.

Corbin's allegations against Ramos are exceptionally serious and deeply troubling. The Court cannot and will not resolve the parties' sharply conflicting accounts of whether their interactions were consensual on this motion – that must abide a trial on the surviving claims. Title VII does not impose individual liability on Ramos, *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012), and TBTA can be held liable for his conduct only under the governing rules of employer liability. Although Ramos was not Corbin's supervisor under *Vance* and TBTA provided reasonable reporting avenues, a jury could find that Sergeant Volpe observed conduct suggesting sexual harassment, had a duty to report it, and unreasonably failed to do so. This factual dispute precludes summary judgment on the negligence theory of employer liability. TBTA's motion for summary judgment dismissing Corbin's sex-based hostile-work-environment claim under Title VII, as pleaded in Count One, is therefore DENIED.

TBTA also asserts a *Faragher/Ellerth* affirmative defense, but that defense does not apply here. When the alleged harasser is a supervisor and the harassment does not culminate in a tangible employment action, the employer may avoid vicarious liability by proving the *Faragher/Ellerth* defense. *Vance*, 570 U.S. at 424. But Ramos – the employee alleged to have created the hostile work environment – was Corbin's co-worker for purposes of Title VII. Accordingly, TBTA's liability turns on whether it was negligent in controlling working conditions. *Id.* ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.").

And Volpe is not alleged to have harassed Corbin. He is relevant because, as a sergeant with a duty to report observed harassment, his knowledge and failure to act may be imputed to TBTA. The claim therefore remains one of employer negligence in responding to a co-worker's harassment, not vicarious liability for harassment committed by a supervisor. *Faragher/Ellerth*

supplies no defense to that negligence theory. As explained above, the evidence concerning what Volpe observed and whether he unreasonably failed to report it presents a triable issue.

### E. A Jury Could Find TBTA Liable for Sex-Based Harassment Under the NYSHRL and NYCHRL (Counts Four and Six)

The remaining portions of Counts Four and Six allege that TBTA subjected Corbin to sex discrimination through the hostile work environment allegedly created by Ramos. *See* Dkt. No. 64, ¶¶ 112–13, 117–19. TBTA's motion turns primarily on whether Ramos's alleged conduct can be imputed to TBTA.

1. Applicable Law

Because all the conduct at issue allegedly occurred after October 11, 2019, the amended NYSHRL applies. *See Cornelius v. Moody's Invs. Serv., Inc.*, 233 A.D.3d 578, 579 (1st Dep't 2024). Under Executive Law § 296(1)(h), harassment is unlawful "regardless of whether such harassment would be considered severe or pervasive" when it subjects an individual to "inferior terms, conditions or privileges of employment" because of a protected characteristic. The statute affords an affirmative defense where "the harassing conduct does not rise above the level of what a reasonable victim of discrimination with the same protected characteristic would consider petty slights or trivial inconveniences." N.Y. Exec. Law § 296(1)(h). It also provides that an employee's failure to complain internally is not determinative of liability. *Id.*

The 2019 amendments did not, however, displace the NYSHRL's separate rules governing when an employee's conduct can be imputed to an employer. *Cornelius*, 233 A.D.3d at 579. Ordinarily, an "employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *Matter of State Div. of Hum. Rts. v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985) (quoting *Matter of Totem Taxi,*

*Inc. v. N.Y. State Hum. Rts. Appeal Bd.*, 65 N.Y.2d 300, 305 (1985)). "Condonation . . . contemplates a knowing, after-the-fact forgiveness or acceptance of an offense," although an employer's "calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." *Id.* Proof of condonation is unnecessary where the harasser is "a high-level managerial employee or someone sufficiently elevated in the employer's business organization to be viewed as its proxy." *Franco v. Hyatt Corp.*, 189 A.D.3d 569, 570 (1st Dep't 2020).

As discussed, the NYCHRL is more protective. A plaintiff establishes gender-based harassment by showing that she was "treated less well than other employees because of her gender"; severity and pervasiveness generally bear on damages, not liability. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78–80 (1st Dep't 2009). An employer may nevertheless prevail by proving that the conduct could be understood only as "petty slights or trivial inconveniences." *Id.* at 80.

Employer liability under the NYCHRL is governed expressly by Administrative Code § 8-107(13)(b). An employer is liable for an employee's unlawful discriminatory conduct where:

> (1) the employee or agent exercised managerial or supervisory responsibility; or
>
> (2) the employer knew of the discriminatory conduct and acquiesced in it or failed to take immediate and appropriate corrective action; or
>
> (3) the employer should have known of the conduct and failed to exercise reasonable diligence to prevent it.

N.Y.C. Admin. Code § 8-107(13)(b). Where the first route applies, the NYCHRL imposes vicarious liability notwithstanding the employer's reasonable preventive measures or the employee's failure to use available reporting procedures. *Zakrzewska v. New School*, 14 N.Y.3d 469, 479–81 (2010). An employer's antidiscrimination policies may mitigate civil penalties and

punitive damages, but they do not defeat liability for discriminatory conduct committed by an employee who exercised managerial or supervisory responsibility. *Id.*

As explained in Section III(D), Corbin's account of what occurred, if credited by the trier of fact, would easily satisfy the substantive harassment standards of both statutes, and the parties' dispute over consent presents a question of credibility for the jury. The dispositive question is whether Ramos's alleged conduct can be attributed to TBTA.

2. <u>A Jury Could Find That TBTA Condoned Ramos's Alleged Harassment Under the NYSHRL</u>

Ramos was not a high-level managerial employee or a proxy for TBTA. Although he held the rank of Sergeant, both Sergeants and BTOs were union-represented positions. Ramos could not hire or fire BTOs, determine their salaries or work tours, conduct performance evaluations, control the bidding process, or impose final discipline. *See* MTA 56.1, ¶¶ 77–98. He could write up a BTO for an infraction, but decisions about any resulting discipline were made by higher-ranking management. At most, Ramos was a first-line supervisor who exercised some authority over BTOs; he was not "sufficiently elevated in [TBTA's] business organization to be viewed as its proxy." *Franco*, 189 A.D.3d at 570. Accordingly, TBTA can be liable under the NYSHRL only if it encouraged, approved, acquiesced in, or condoned Ramos's conduct.

There is no evidence that TBTA affirmatively encouraged or approved Ramos's alleged conduct. But Corbin has raised a triable issue as to knowing acquiescence or condonation. Her failure to complain internally does not automatically defeat her claim, but it remains relevant to whether TBTA possessed the knowledge necessary to forgive, accept, or deliberately disregard the conduct. *See* N.Y. Exec. Law § 296(1)(h); *Eckhart v. Fox News Network, LLC*, 2026 WL 1113472, at *4 (2d Cir. Apr. 24, 2026).

As explained in Section III(D), a jury could find that Sergeant Volpe observed Ramos engaging in conduct that suggested sexual harassment and failed to report it despite having a duty to do so. Corbin testified that Volpe "would have overseen or should have noticed" Ramos attempting to hug or touch her. Ramos testified that a sergeant who observed workplace conduct that could constitute sexual harassment was required to report it. Volpe denied witnessing inappropriate conduct. Whether Volpe actually observed Ramos's conduct, what that conduct would have conveyed to a reasonable supervisor, and why Volpe failed to act are disputed questions of fact.

These disputes are material under the NYSHRL. "Condonation . . . contemplates a knowing, after-the-fact forgiveness or acceptance of an offense," and an employer's "calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." *Matter of State Div. of Hum. Rts. v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985). If the jury credits Corbin's account and finds that Volpe knowingly observed overtly sexual and unwelcome conduct but deliberately failed to report or stop it, the jury could find more than mere negligence. It could find knowing acquiescence or calculated inaction by a supervisory employee whose knowledge and conduct were attributable to TBTA.

The December 22 communication to the MTA Inspector General's Office, standing alone, would not support that finding. For the reasons set out above, Corbin was already out of the workplace, experienced no further harassment, and was separated six days later. No reasonable jury could infer from that interval alone that TBTA knowingly accepted or deliberately disregarded Ramos's conduct while Corbin remained exposed to it. *See Doe v. State*, 89 A.D.3d 787, 788 (N.Y. App. Div. 2011) ("It is only after an employer knows or should have known of improper discriminatory conduct that it can 'undertake or fail to undertake action which may be construed

as condoning the improper conduct.'" (citations omitted)). But the evidence concerning Volpe supplies an independent basis on which a jury could find condonation before Corbin left the workplace.

Accordingly, TBTA's motion for summary judgment dismissing the sex-discrimination portion of Count Six is DENIED.

3. A Jury Could Find TBTA Liable Under the NYCHRL

TBTA is vicariously liable under N.Y.C. Administrative Code § 8-107(13)(b)(1) if Ramos "exercised managerial or supervisory responsibility." This inquiry is not controlled by whether TBTA formally classified Ramos as "management" or whether he possessed ultimate authority to hire and fire employees. In *Melendez v. New York City Transit* Authority, 204 A.D.3d 542, 543 (1st Dep't 2022), for example, the First Department held that a jury could find managerial or supervisory responsibility even though the harasser's "official role was nonsupervisory" and he lacked authority to hire or fire, because there was evidence that he possessed "the de facto ability to direct other employees."

The record contains ample evidence from which a jury could make such a finding here. Ramos was promoted from BTO to Sergeant in 2016. He described himself as a supervisor and testified that Sergeants conducted roll call, told BTOs which vehicles to use and when to take breaks, communicated special assignments, approved overtime, directed officers to respond to alarms and other incidents, and could write up BTOs for infractions. Dkt. No. 107-2, Ramos Dep. 132:9–134:24. He also acknowledged that he had approved Corbin's overtime and that, when she worked overtime, he likely told her which assignment she had. *Id.* at 83:3–24, 135:5–18.

TBTA emphasizes that Corbin was formally assigned to the FETF, which reported to Inspector Anthony Tramontana, and that Ramos generally did not serve as the Desk Sergeant.

Those facts bear on the extent of Ramos's authority but do not eliminate the factual dispute. A jury could find that Ramos possessed *de facto* supervisory responsibility.

The Court need not decide whether § 8-107(13)(b)(1) would impose liability whenever the harasser supervised any employee, regardless of whether he supervised the plaintiff. The Second Circuit expressly declined to resolve that question in *Eckhart*, 2026 WL 1113472, at *2–3. Here, the evidence would permit a jury to find that Ramos exercised at least some supervisory authority over Corbin herself.

If the jury makes that finding, then TBTA is liable under § 8-107(13)(b)(1) without regard to whether Corbin reported the conduct internally or whether TBTA maintained adequate antiharassment policies. *Zakrzewska*, 14 N.Y.3d at 479–81. TBTA can rely on its policies and corrective measures in seeking mitigation of civil penalties or punitive damages, but those measures do not furnish a complete defense to liability under the supervisor provision. *Id.* Because the supervisory-responsibility route independently presents a triable issue, the Court need not determine whether Corbin could also establish liability under the actual-knowledge or constructive-knowledge provisions of § 8-107(13)(b)(2) and (3).

Accordingly, TBTA's motion for summary judgment is DENIED as to the sex-discrimination portion of Count Four.

### F. Ramos Is Entitled to Summary Judgment Except as to the Direct NYCHRL Sex-Based Hostile-Work-Environment Claim

Corbin asserts direct discrimination claims under the NYCHRL and NYSHRL in Counts Four and Six and aiding-and-abetting claims under those statutes in Counts Eight and Nine. The Court therefore addresses both direct and accessorial liability.

1. Direct Discrimination Claims

The direct NYSHRL claim against Ramos fails as a matter of law. Executive Law § 296(1) prohibits specified discriminatory practices by an "employer." Under controlling New York law, the NYSHRL "does not render employees liable as individual employers." *Doe v. Bloomberg L.P.*, 36 N.Y.3d 450, 458–59 (2021). The statute distinguishes an employer from the employees and agents whom other subdivisions expressly reach. *Id.* Thus, a corporate employee does not become directly liable under § 296(1) merely because he holds a managerial or supervisory position. *See id.*; *Lewis v. Triborough Bridge & Tunnel Authority*, 77 F. Supp. 2d 376, 379–80 (S.D.N.Y. 1999) (holding that an employee's supervisory control and ability to review and comment on performance did not make him directly liable under § 296(1)).

Ramos was an employee of TBTA, not Corbin's employer. He had no ownership interest in TBTA and lacked authority to hire or fire employees, establish salaries, or make the personnel decisions at issue. Accordingly, regardless of whether he exercised some supervisory authority over Corbin, he cannot be held directly liable under § 296(1). The direct sex- and disability-discrimination components of Count Six are DISMISSED as against Ramos. Any individual liability under the NYSHRL must arise, if at all, under the aiding-and-abetting provision of § 296(6).

Again, the NYCHRL is different. Section 8-107(1)(a) expressly applies to "an employer *or an employee or agent thereof.*" An employee is directly liable only if he had a role in administering the plaintiff's employment. *Russell v. New York University*, 42 N.Y.3d 377, 389–92 (2024). This requirement extends beyond employees with formal managerial titles to those who "wield any ability to dictate or administer the compensation, terms, conditions, or privileges of the plaintiff's employment." *Id.* at 390. Thus, evidence that an employee possessed "the de facto ability to direct other employees" may suffice even in the absence of formal hiring or firing

authority. *Id.* (quoting *Melendez v. New York City Transit Authority*, 204 A.D.3d 542, 543 (1st Dep't 2022)).

For substantially the reasons discussed in Section III(E)(3), a jury could find that Ramos possessed the requisite ability to control aspects of Corbin's employment. The limitations on his authority bear on the weight of the evidence, but they do not entitle him to judgment as a matter of law.

As also explained above, the parties' dispute over consent presents a question for the jury. Viewing the evidence in Corbin's favor, a jury could find that Ramos subjected her to sex-based treatment that vastly exceeds the "petty slights or trivial inconveniences" standard while occupying a position that permitted him to supervise certain aspects of her employment. *See supra* Sections III(D) and III(E)(1). Ramos is therefore not entitled to summary judgment dismissing the sex-discrimination component of Count Four.

But as to the disability component of that count, Corbin identifies no evidence that Ramos participated in the decisions to place her on IOD leave, deny or modify an accommodation, administer the interactive process, reassign her, or separate her pursuant to Civil Service Law § 71. Ramos testified that he had no authority over her IOD status, return to work, or accommodation request. Dkt. No. 107-2, Ramos Dep. Tr. at 135:19–24. Corbin's subjective belief that his popularity might allow him to influence more senior officials does not establish that he took any disability-related action or acted with disability-based animus. Ramos is therefore entitled to summary judgment dismissing the disability-discrimination component of Count Four.

2. Aiding-and-Abetting Claims

Executive Law § 296(6) and Administrative Code § 8-107(6) make it unlawful for "any person" to aid, abet, incite, compel, or coerce a violation of the respective statute. Aiding-and-

abetting liability is derivative: another party must have committed an underlying violation of the NYSHRL or NYCHRL. *Russell v. New York University*, 42 N.Y.3d 377, 388 (2024) ("A pre-condition to proving aiding and abetting pursuant to the NYSHRL and NYCHRL is a finding of discrimination." (citation omitted)); *Strauss v. New York State Department of Education*, 26 A.D.3d 67, 73 (3d Dep't 2005). The alleged aider must also have actually participated in the violation and shared the principal actor's unlawful purpose. *See Feingold v. New York*, 366 F.3d 138, 157–58 (2d Cir. 2004); *Bistreich v. City of New York*, 191 A.D.3d 554, 554 (1st Dep't 2021).

The crux of the disagreement is over whether vicarious attribution itself supplies the "other party" whose violation the employee aided. The broader federal rule treats the employer as the principal violator and the employee as the aider, even though the same conduct establishes both forms of liability. The narrower New York rule requires the employee to assist or act jointly with another wrongdoer.

The broader federal rule derives from *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995). *Tomka* held that allegations that each of three individual defendants assaulted the plaintiff and thereby created a hostile work environment were sufficient under § 296(6). *Feingold* later described *Tomka* as permitting liability against a coworker who "actually participates in the conduct giving rise to a discrimination claim," even when the coworker lacks hiring or firing authority. 366 F.3d at 158. Neither decision separately analyzed whether a lone principal wrongdoer could aid or abet an employer whose liability rests entirely on the attribution of that wrongdoer's conduct.

Several courts in this district have extended *Tomka* to that lone-actor setting. Under their reasoning, the employee does not aid his own conduct; he aids the employer's statutory violation. *See, e.g.*, *Johnson v. County of Nassau*, 82 F. Supp. 3d 533, 536–39 (E.D.N.Y. 2015); *Farmer v.*

*Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 337–38 (S.D.N.Y. 2020); *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 73–75 (S.D.N.Y. 2020). Most recently, *Hutaj v. 77 Bleecker Street Corp.*, 2026 WL 607762, at 10 (S.D.N.Y. Mar. 4, 2026), declined to dismiss aiding-and-abetting claims under both the NYSHRL and NYCHRL, reasoning that such claims are permissible when "a corporate employer is considered the principal actor—even if the corporate employer is itself only vicariously liable through the acts of its employees." Under this approach, the employee's conduct creates the employer's liability, and the employer's liability then becomes the predicate for holding the same employee liable as an aider and abettor.

As the court recognized in *McHenry*, the *Tomka* decision can create "a strange and confusing circularity" when the employer's liability rests exclusively on the conduct of the individual defendant. 510 F. Supp. 3d at 73–74 (internal quotation marks omitted). It nevertheless concluded that "*Tomka* is Circuit law." *Id.* at 74. In *Tully-Boone v. North Shore–Long Island Jewish Hospital System*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008), the court likewise reasoned that "until the Second Circuit revisits the issue, *Tomka* is the law in this Circuit." These decisions treat the employer's derivative liability as a sufficiently distinct violation for the employee to aid.

But New York's appellate courts, construing the NYSHRL and NYCHRL, have adopted the narrower (and in this court's opinion, the more sensible) rule that one cannot aid and abet one's own conduct. In *Hardwick v. Auriemma*, 116 A.D.3d 465, 468 (1st Dep't 2014), *leave to appeal denied*, 23 N.Y.3d 908 (2014), the First Department held that because the defendant's "own actions" gave rise to the discrimination claim, "he cannot also be held liable for aiding and abetting." In *Bistreich*, the First Department reiterated that an aiding-and-abetting claim requires a "community of purpose" with another wrongdoer and "cannot be based on an individual's own conduct." 191 A.D.3d at 554. It then squarely rejected the broader federal rule, stating that "To

the extent *Tomka* . . . and its progeny hold otherwise, we decline to follow them." *Id.* Under the New York rule, attributing an employee's conduct to an employer does not establish that the employee assisted someone else in committing discrimination.

The Second Department has applied the same rule specifically to the NYCHRL. For example, in *Perez v. Y & M Transportation Corp.*, 219 A.D.3d 1449, 1450–51 (2d Dep't 2023), the court sustained direct NYCHRL discrimination, hostile-work-environment, and retaliation claims against an employer and its manager, but dismissed the aiding-and-abetting claim against the manager because "he may not be held liable for aiding and abetting his own violation of the NYCHRL." *Id.* at 1451. The court reached that conclusion even after recognizing that the NYCHRL must be construed "broadly in favor of discrimination plaintiffs." *Id.* at 1450 (internal quotation marks omitted). Thus, even the NYCHRL's liberal-construction requirement does not collapse primary and accessorial liability into the same claim.

The New York rule still permits aiding-and-abetting liability where several individuals act together. For example, in *Kouri v. Eataly NY LLC*, 199 A.D.3d 416, 418 (1st Dep't 2021), several security guards allegedly acted jointly in subjecting the plaintiff to discriminatory abuse and physical conduct. The First Department held that, "Since they are alleged to have acted jointly," their conduct could support aiding-and-abetting liability. *Id.* The same conduct could also be attributed to the corporate employer. *Kouri* thus permits an individual to be both a participant in discrimination and an aider of another participant. What the New York rule does not permit is treating a lone employee as an accessory to his own conduct merely because that conduct is also attributed to the employer.

Federal decisions applying the New York cases have sometimes adopted the same distinction. In *Boyce v. Weber*, 2020 WL 5209526, at *2 (S.D.N.Y. Sept. 1, 2020), the court

rejected the broader rule where there was only one individual defendant. "Put simply, it is oxymoronic to say that an individual defendant can aid and abet his own primary conduct." *See also Bautista v. PR Gramercy Square Condominium*, 642 F. Supp. 3d 411, 429 (S.D.N.Y. 2022) (dismissing the claim against the principal discriminator because he could not "aid and abet his own conduct"); *Romano v. A360 Media, LLC*, 2023 WL 348459, at 13 (S.D.N.Y. Jan. 20, 2023).

Counts Eight and Nine arise under the NYSHRL and NYCHRL, not Title VII. The New York Court of Appeals – the State's highest court – has not addressed whether an individual can aid and abet his own discriminatory conduct merely because that conduct is also imputed to his employer. *Hardwick*, *Bistreich*, and *Perez*, however, are decisions of the Appellate Division, New York's intermediate appellate court, and each holds that an individual cannot aid and abet his own violation. These decisions are not to be disregarded absent persuasive evidence that the Court of Appeals would decide otherwise. *See DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005) ("Although we are not strictly bound by state intermediate appellate courts, rulings from such courts are a basis for 'ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" (citation omitted)). No persuasive evidence suggests that the Court of Appeals would decide otherwise. The Appellate Division's rule also preserves the ordinary distinction between primary and accessorial liability: an individual cannot aid and abet his own conduct. The Court therefore follows *Hardwick*, *Bistreich*, and *Perez*. Ramos can be liable as an aider and abettor only if he assisted another person's violation and shared that person's unlawful purpose, not merely because his own conduct may also be attributed to TBTA.

The survival of the NYSHRL sex-harassment claim against TBTA supplies a potential predicate violation for Count Eight, but a predicate violation alone does not establish aiding-and-

abetting liability. TBTA's potential liability under the NYSHRL rests on a finding that Sergeant Volpe knowingly observed conduct suggesting sexual harassment and condoned it by deliberately failing to report or stop it. Corbin identifies no evidence that Ramos and Volpe acted jointly, shared a discriminatory purpose, or agreed that Volpe would conceal or disregard Ramos's conduct. Nor is there evidence that Ramos encouraged, facilitated, or otherwise assisted Volpe's alleged inaction.

Ramos's alleged harassment is the primary conduct underlying the surviving NYSHRL claim; it is not assistance that he rendered to another wrongdoer. The fact that Volpe's alleged condonation may expose TBTA to liability does not establish a "community of purpose" between Volpe and Ramos. Because Corbin identifies no other person whose NYSHRL violation Ramos knowingly assisted, Ramos cannot be held liable for aiding and abetting the harassment he allegedly committed himself. Ramos is therefore entitled to summary judgment dismissing Count Eight.

Count Nine fails for the same basic reason. A jury could find TBTA vicariously liable for sex-based harassment under Administrative Code § 8-107(13)(b)(1) because Ramos exercised managerial or supervisory responsibility. This statutory attribution establishes a potential predicate claim against TBTA, but it does *not* establish that Ramos aided or abetted anyone else who was discriminating against Corbin.

Corbin specifically alleges that Ramos *personally* committed the harassment. The same conduct supplies the basis for both his direct liability and TBTA's vicarious liability. But Corbin identifies no other person who joined Ramos in the harassment, encouraged it, facilitated it, or shared his discriminatory purpose. The record therefore contains no "community of purpose" between Ramos and another individual wrongdoer.

Treating TBTA's vicarious liability as the separate violation that Ramos aided would only compound the circularity identified by the cases discussed above. Ramos's alleged harassment would first be attributed to TBTA, and TBTA's resulting liability would then be used to characterize that same harassment as assistance Ramos rendered to TBTA. On that theory, every supervisor whose conduct triggers employer liability under § 8-107(13)(b)(1) would automatically become both the principal wrongdoer and an aider and abettor, without any second participant or separate act of assistance. Accessorial liability would no longer require accessorial conduct. Because the record identifies no second participant, Ramos cannot be held liable as an aider and abettor of the harassment he allegedly committed himself.

Ramos remains subject to direct NYCHRL liability for the harassment alleged in Count Four, while TBTA remains subject to vicarious liability for the same conduct. Count Nine identifies no additional act, participant, or theory of aiding and abetting. It is therefore duplicative of the surviving direct and vicarious-liability claims and can be dismissed on that basis.

Accordingly, Ramos's motion is GRANTED as to (1) the direct sex- and disability-discrimination claims asserted against him under the NYSHRL in Count Six; (2) the disability-discrimination component of the direct NYCHRL claim asserted against him in Count Four; (3) the NYSHRL aiding-and-abetting claim in Count Eight; and (4) the NYCHRL aiding-and-abetting claim in Count Nine. But the motion is DENIED only as to the direct sex-based hostile-work-environment claim asserted against Ramos under the NYCHRL in Count Four.

### G. Plaintiff's Motions to Seal Are Granted

Plaintiff moves to maintain under seal the materials filed at Dkt. Nos. 89-24, 89-25, 89-26, 104-6, and 107-14. *See* Dkt. Nos. 95, 108. The first three entries are exhibits submitted with the MTA Defendants' motion for summary judgment; the latter two contain substantially the same

materials submitted in opposition to the pending motions. No party or member of the public has opposed the requests.

Documents submitted for a court's consideration on a summary-judgment motion are judicial documents to which "a strong presumption of access attaches, under both the common law and the First Amendment." *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006)). Consequently, continued sealing is permissible only upon "specific, on-the-record findings that sealing is necessary to preserve higher values" and only where the relief is "narrowly tailored to achieve that aim." *Id.* at 47–48 (internal quotation marks omitted). The Court must conduct a particularized review of each document. *Id.* at 48–51.

A sufficiently weighty privacy interest may overcome the presumption of access. In assessing that interest, the Court considers "the degree to which the subject matter is traditionally considered private rather than public," as well as "The nature and degree of injury" that disclosure could cause. *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995). Matters involving private personal affairs and embarrassing conduct having no broader public ramifications weigh more heavily against disclosure. *Id.*

The Court has reviewed each of the documents at issue individually. They consist of screenshots of calendar entries created by Corbin. The entries are akin to private diary or journal entries and contain extremely intimate and explicit descriptions of the sexual encounters at issue in this litigation. Plaintiff maintains that disclosure of the entries in their original form would cause her additional distress. Dkt. No. 95.

The Court recognizes that the entries were submitted in connection with dispositive motions and therefore carry a strong presumption of access. But the public's ability to monitor

the Court's decision does not require public disclosure of Corbin's private entries or the graphic details contained in those entries. The dates of the alleged incidents, the general nature of Corbin's allegations, Ramos's competing account, and the evidentiary role of the calendar entries are all disclosed in the parties' public submissions and in this Opinion. Public access to the entries themselves would add little to an understanding of the Court's reasoning while substantially intruding upon Corbin's legitimate privacy interests.

Maintaining the complete versions presently filed under seal is narrowly tailored at this stage of the litigation. The entries contain intimate descriptions extending beyond the facts necessary to understand the Court's summary-judgment ruling. Requiring public filing of heavily redacted versions would either disclose the information whose privacy warrants protection or leave fragmented documents of little utility. The Court is not sealing the parties' briefs, their Rule 56.1 submissions, the underlying deposition testimony, or any portion of this Opinion. The relief is confined to these few exhibits.

Corbin should understand, however, that this ruling does not determine how the calendar entries will be treated if offered or used at trial. Evidence presented to the jury in open court is subject to an especially substantial presumption of public access. *See Mirlis v. Greer*, 952 F.3d 51, 60–61 (2d Cir. 2020). If either party seeks to admit or otherwise present any portion of the sealed materials in open court, those materials must be made publicly available in their entirety.

Accordingly, Plaintiff's motions to seal are GRANTED without prejudice to reconsideration in connection with trial.

**Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Defendants Triborough Bridge and Tunnel Authority ("TBTA"), Metropolitan Transportation Authority

("MTA"), and New York City Transit Authority ("NYCTA") is GRANTED IN PART and DENIED IN PART. Defendant Robert Ramos's motion for summary judgment is likewise GRANTED IN PART and DENIED IN PART.

The disposition of the claims is as follows:

<u>Count One – Title VII Discrimination.</u> MTA and NYCTA are entitled to summary judgment dismissing Count One as against them. TBTA's motion for summary judgment dismissing Count One is DENIED. Count One was not asserted against Ramos. Corbin's Title VII sex-based hostile-work-environment claim against TBTA will proceed to trial.

<u>Count Two – ADA Discrimination.</u> MTA, NYCTA, and TBTA are entitled to summary judgment dismissing all theories asserted in Count Two, including disability discrimination, failure to accommodate, and discriminatory termination. Count Two was not asserted against Ramos and is DISMISSED in its entirety.

<u>Count Three – ADA Retaliation.</u> MTA, NYCTA, and TBTA are entitled to summary judgment dismissing Count Three. Count Three was not asserted against Ramos and is DISMISSED in its entirety.

<u>Count Four – NYCHRL Discrimination.</u>

1. MTA and NYCTA are entitled to summary judgment dismissing Count Four in its entirety as against them.

2. TBTA is entitled to summary judgment dismissing the disability-discrimination component of Count Four. Its motion for summary judgment dismissing the sex-based hostile-work-environment component is DENIED. The NYCHRL sex-based hostile-work-environment claim against TBTA will proceed to trial.

3. Ramos is entitled to summary judgment dismissing the disability-discrimination component of Count Four. His motion for summary judgment dismissing the direct sex-based hostile-work-environment component is DENIED. The direct NYCHRL sex-based hostile-work-environment claim against Ramos will proceed to trial.

<u>Count Five – NYCHRL Retaliation.</u> MTA, NYCTA, and TBTA are entitled to summary judgment dismissing Count Five. Count Five was not asserted against Ramos and is DISMISSED in its entirety.

<u>Count Six – NYSHRL Discrimination.</u>

1. MTA and NYCTA are entitled to summary judgment dismissing Count Six in its entirety as against them.

2. TBTA is entitled to summary judgment dismissing the disability-discrimination component of Count Six. However, its motion for summary judgment dismissing the sex-based hostile-work-environment component is DENIED. Corbin's NYSHRL sex-based hostile-work-environment claim against TBTA will proceed to trial.

3. Ramos is entitled to summary judgment dismissing the direct sex- and disability-discrimination claims asserted against him in Count Six. Count Six does not otherwise survive against Ramos.

<u>Count Seven – NYSHRL Retaliation.</u> MTA, NYCTA, and TBTA are entitled to summary judgment dismissing Count Seven. Count Seven was not asserted against Ramos and is DISMISSED in its entirety.

<u>Count Eight – Aiding and Abetting Under the NYSHRL.</u> Ramos is entitled to summary judgment dismissing Count Eight. Count Eight was asserted only against Ramos and is DISMISSED in its entirety.

<u>Count Nine – Aiding and Abetting Under the NYCHRL.</u> Ramos is entitled to summary judgment dismissing Count Nine. Count Nine is DISMISSED in its entirety.

All disability-discrimination claims, all retaliation claims, both aiding-and-abetting claims, and all direct NYSHRL claims against Ramos are DISMISSED. The four claims remaining for trial are:

1. Corbin's Title VII sex-based hostile-work-environment claim against TBTA under Count One;

2. Corbin's NYCHRL sex-based hostile-work-environment claim against TBTA under Count Four;

3. Corbin's direct NYCHRL sex-based hostile-work-environment claim against Ramos under Count Four; and

4. Corbin's NYSHRL sex-based hostile-work-environment claim against TBTA under Count Six.

The motions to seal are GRANTED for the reasons and to the extent stated above.

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 76, 77, 78, 81, 86, 95, and 108. The Clerk is further directed to terminate MTA and NYCTA as Defendants. Because claims remain pending against TBTA and Ramos, the Clerk should not enter final judgment or close the case at this time.

This constitutes the Opinion and Order of the Court. It is a written decision.

Dated: August 4, 2026
New York, New York

U.S.D.J.

BY ECF TO ALL COUNSEL